Michael Levine, Co-Counsel, Joel Levine & Susan Lynette Edpa does not apply to this case. Woodford v. Garceau is not controlling because the Federal District Court in the Northern District had a local rule in 1990 which deemed the pleadings filed by the petitioner in this case a writ of habeas corpus with leave to amend. And I invite you to excerpt of record, page 121, paragraph C, which has the exact language, quote, The specification of non-frivolous issues required under this paragraph shall be deemed to be a petition for writ of habeas corpus with leave having been granted to amend the petition. The temporary stay will remain in effect for 120 days to allow newly appointed counsel to prepare and file the finalized petition. So they refer to the initial filing as a petition and they refer to the second as a finalized petition. I refer to it in my briefs as an amended petition. So the petition actually filed should be deemed an amended petition which was filed in 1996. Now, counsel, let me stop you right there because I appreciate your argument and on a clean slate, it makes sense what you're saying, but it's not a clean slate. We have this case from the Supreme Court, Woodford, which is tough for you guys in this case. It is tough. So help me get past that case. It is distinguishable because Woodford does not discuss or deal with a local rule, which this court has said that parties can justifiably rely on the word of the court. Woodford does not deal with the local rule of a federal district court saying that the petition filed here was a petition for habeas corpus. There's no discussion of that in Woodford. Let me ask you this because in the context of statute of limitations, which is not jurisdictional, I think there is some looseness or tolling that courts can apply, but are you aware of any case that allows sort of an equitable tolling to apply to a standard of review, which is what we're dealing with here? Well, Your Honor, with due respect, it's a lot more than a standard of review. This is the filing of a petition. AEDPA does a lot more than change a standard of review. Certainly. Now, it's true that the state has filed a couple of nines, as alluded to, Phillips and Daychild. These are Ninth Circuit cases which hold that a defendant has no due process reliance interest in the change of a standard of review. In those cases, it was a standard federal criminal cases where the court granted a downward departure or granted an upward departure, and the standard of review before the Protect Act was abuse of discretion. The defendant appealed, but while the appeal was pending, Congress enacted the Protect Act, which changed the standard of review from abuse of discretion to de novo. And the defendant argued, well, he had a, argued in part, he had a due process, it was unfair for this new standard of review to go into effect. And the court held, he had, he argued that he had a due process reliance interest. The court said, no, it's not substantial enough, just a change of standard of review from abuse of discretion to de novo. But what we have here, your honors, is far more than a change of standard of review. We have, we have AEDPA changes the governing law. AEDPA says not only does this, this court has to look only to the holdings of the Supreme Court of the United States virtually, not under pre-AEDPA law, this court could look to the circuit's own holdings on whether or not there had been error. So it changes the governing law. It changes the statute of, it institutes a statute of limitations for the first time in federal habeas corpus. Okay, but that changes the ability to file amendments to habeas corpus petitions. Because now under Felix v. Mele, you've got to come within this, to get an amendment to a habeas corpus petition, you now have to show that the amended petition, the amended claim has, comes from the core facts that were in the original claims. This has already affected this case because I lost, court below, it's not an issue here, two amendments I wanted to make but was unable to come within the Felix v. Mele framework. Not only that, it has changed what evidence can be introduced in federal court. Because of AEDPA and Cullen v. Pinholster's interpretation of AEDPA, you can't introduce supposedly new evidence in the federal district court. So in ineffective assistance cases, one of the issues here is ineffective assistance. There's now this double deference, this double deference mountain, if you will, that a petitioner has to overcome on ineffective assistance. So all those changes have been wrought by AEDPA, far more than just a simple change of review from abuse of discretion to de novo. Petitioner Rowland and his lawyers at the time had a right, a justifiable reliance, due process interest in relying on the local rule. This court has said that we can rely, we must rely, in Perry v. Brown, we must rely on what the court says. Now it's true, the one exception, and the state points this out and I pointed it out in my opening brief, if there's a mandatory jurisdictional deadline, and even if a district judge says to a lawyer, you have 50 days to file your notice of appeal, and the lawyer relies on that, too bad. Too bad. Even though a federal judge told you you had 50 days, it turns out it's wrong, you only have 14 days, and it's too bad. Now there might be an ineffective assistance claim, there probably would be, where a good lawyer would say, well, that lawyer was ineffective in relying on what the district court said. He should have done his own research and wrong. But that doesn't apply here in this case at all. The state said, well, how can there be justifiable reliance? What would the petitioner have done differently? Well, if you take a look at the memo of issues filed on ER 129, Excerpt of Record 129, this was the Memorandum and Application for Temporary Stay of Execution, Specification of Non-Frivolous Issues. This was filed, I don't have a file stamp on it, but it's dated June 17, 1995. All counsel would have done and needed to do was cross out the word Memorandum, your honor, that title, and title it Petition for Habeas Corpus. And this case wouldn't even be here. That's all they would have had to do. I submit to you, your honor, it is inherently unfair. It is sandbagging. Why do I say it's sandbagging? The state, I'd ask the court to take judicial notice, if I may. I've given a copy to the AG, and Judge Wardle, I can't, you're there, I can't. Well, and counsel, we can go ahead and look at what you provided to the courtroom deputy. And if you want to file a judicial notice, you file a motion with the court so it's clear. But we can look at it. What this is, your honor, this is from the internet last night, preparing for oral argument. It's Local Rules Attorney's Advisory Committee from the Northern District. And it lists the committees that the Northern District has. One of the committees is the Habeas Corpus Committee. Now, Grant, this is right now, today. This is today. The Northern District of California has a Habeas Corpus Committee. On that committee, one of the members is Peggy S. Ruffra. She is a Deputy Attorney General. And she is, actually, she's been an Attorney General for many years, a deputy, and she's in the docket sheet. You'll see her name mentioned. Why am I, why is this important? I don't have evidence. I can't prove it. I can't show it. I couldn't find it. But I have reason to believe, and common sense tells me, that in 1990, when this local rule was adopted, at issue here, the state participated in the drafting of the local rule. There must assuredly have been a state representative in 1990. I'm not sure I understand the point of that, though. I mean, the concern is about EPTA. And EPTA didn't come along for a few years later. So it can't be that when this local rule was enacted, the intent was to permit attorneys and petitioners to rely upon their characterization of non-frivolous issues as sufficient to satisfy the requirements to file before EPTA. So, I mean, there were reasons for wanting to get things on file. I think they mostly had to do with stays of execution. But I don't see how that provides any support for the notion that your client relied upon the local rule to believe that EPTA wouldn't take effect and apply to his case. I mean, I doubt that anybody at that time was thinking about the EPTA problem. It's developed since. Well, I think I understand what you're saying, Your Honor, but I respectfully disagree. I think that lawyers, when they see the local rule saying this petition is deemed a petition for habeas corpus, whatever the purpose in instituting that or establishing that local rule, whatever the purpose... Well, I'll accept the rule exists, and I'll accept that the California Attorney General's office knew about the rule, whether they had a member on the committee or not. They were bound to know about the rule, and in the six years that passed before EPTA came along, they surely dealt with that rule. So they're commissioned with knowledge of it. That still may not satisfy their reliance problem. Well, I disagree with the court. Counsel, I have a question. So EPTA was enacted in what year? 1996, April 24th, I believe is the effective date, 1996. Right, that's the effective date, but wasn't it enacted before? It was enacted with a provision saying it would go into effect as of, right? I'm not certain about that, but I do know that it has been held, and I'm not sure if it's in Woodford v. Garceau or if it's actually in the legislation, but it is effective, as far as I know, April 24th, 1996. I don't know if it was actually in the legislation or not, Your Honor. Well, my question is really going to you. I believe EPTA was actually enacted before its effective date, and the effective date is in the statute. And it put everybody on notice, like the year before it went into effect, that this would go into effect. I'm not sure about that, Your Honor. I believe that the statute, I believe it went into effect the day it was signed by President Clinton, but I could be wrong. Well, it was enacted with an effective date a year out, so that undermines your reliance argument to some degree, because you filed your stay motion on August 26th, 1994. I'm not sure what the timeline is there. Stay motion was filed 1994, but then there was also a memorandum of possible issues on habeas corpus was filed somewhat later in 1995. Counselor, I don't mean to jump in, but you have your co-counselor who wants to ask for time, and you've run up on almost half of yours. Okay. I have no time. Okay. Let's stop the clock. You can maybe pick it up, but I want to make sure we get to hear from your fellow counsel. Okay. So, Joe, I wouldn't mind having him taking a little more time with this case, since this is a capital case. Sure. Okay. And hearing from him and Lynette, if that's okay with you. Okay. Fair enough. Go ahead. Mr. Levine over there, sit down. Mr. Levine, come back up to the mic. Thank you. Thank you. Thank you. Go ahead. Why don't we go ahead and move on, though, to that. I'm going to move on to the Lynette issue. Great. I'm going to move on right now, if I just may have a moment to find my notes on that. Yes. It was ineffective assistance, I have argued and I maintain, to fail to call Susan Lynette to the witness stand in the penalty phase to introduce Roland's complete statement to her. As we know, Roland confessed to her that he murdered or killed Jerry Richardson. We know that. But we also know that at the same time, he gave her an explanation for why he killed her. He explained that he killed her because there was a quarrel over his status as an ex-felon. And there was also, in part, a quarrel over methamphetamine. Now, the trial judge at the time was dealing with the issue of whether or not this statement could come out in the guilt phase. And he held that, well, if that statement comes out in the guilt phase, then the state is going to be able to introduce his whole prior record in the guilt phase. So the attorneys decided not to introduce that statement in the guilt phase. But the trial judge at the time said, well, you know, I'm paraphrasing now. So basically, that's a powerful statement. That would be good evidence for you in the guilt phase because that could tend to lower the charge from first-degree murder to second-degree murder or even manslaughter. This is the trial judge. As a matter of fact, yeah, I said you could argue quarrel, a killing after a sudden quarrel. Now, that trial judge articulated exactly what trial counsel should have done in the penalty phase and why it was ineffective assistance for not to introduce that statement in the penalty phase. Counsel, how would it have helped him in the penalty phase? It would have helped him in the penalty phase for two different reasons. First of all, it could have raised a lingering doubt, and under California law, California permits lingering doubt. It could have permitted an argument to the jury that the murder, the killing, was not in the course of a rape or over a rape. It was a killing about a quarrel. It was a killing that came about in the heat of passion over a quarrel, over insult or anger because he was being insulted, that he was an ex-convict. And that could have caused even one juror, even one juror is all it takes under California law. It could have caused even one juror to say, yeah, you know, I have a doubt. I have a question about whether the murder actually was in the course of a rape or not, even if you believe he raped. But it still is whether the murder was in the course of the rape. Second, entirely apart from that lingering doubt, a juror could say, well, you know, this might have been a killing. He lost his temper. He just went nuts. But it wasn't a premeditated murder during the course of a rape. It was, as the trial judge said, it was a killing that came about because of a quarrel. That's a terrible thing. So the rape made him, because, didn't that make him death eligible because it was in the course, right? Yes, yes. That was the special punishment. Wasn't that found at the guilt phase, though? Yes, it was. Yes, it was. But that still can be a lingering doubt in the penalty phase. And I cited, Your Honor, I cited two articles in my reply brief to you which show, they demonstrate, according to the authors, that lingering doubt, even though there's been a finding of guilt in the guilt phase, jurors can still, in the penalty phase, even though they voted for guilt in the guilt phase, can still have a lingering doubt about their vote. And the articles I cited in my reply brief show, demonstrate, that one of the strongest grounds for jurors voting for life instead of death, one of the most often cited reasons, is lingering doubt. But is it doubt about whether this person did it or doubt about exactly what drove him to do it? The latter category, I mean, to be fair, that he did it in a fit of rage because she talked about his past record at the same time she had other things to say that were pretty unflattering, doesn't really paint a prettier picture of him. And whether, I mean, I confess I have a hard time understanding how the jury's going to be motivated by that testimony to reach a different result. Well, all I can say is point you back to what the trial judge said, Your Honor. A highly experienced trial judge who had sat at many, many, many trials, he said he thought otherwise. He thought, no, this evidence, if believed, and there's no reason not to believe it, she was a key government witness testifying the confession, she says this is the reason he gave. Now, it's true. Did he testify? No. At neither phase? No. Okay. Roland did not testify in either phase. And remember, Your Honor, we're talking about only one juror of 12. So it may be that certain jurors would say, oh, well, this doesn't do anything. But all it would take is one juror to say, no, I think it does make a difference. I think it would. And I would vote for life. So that's my argument. Now, it's true that there were other statements that weren't so flattering that she had to say something about, oh, if I can't. Didn't he threaten her parents? Supposedly, supposedly. And so why couldn't this be a strategic decision that I don't want to, by the attorney, say I don't want to open up that can of worms. We've got enough problems. Well, it's true that the idea that he would be killing his parents is not a good thing in a penalty phase. But there was some dispute because she said that he said, no, no, no, you misunderstood. I didn't say I would kill my parents. I said it would kill my parents. But even so, I'm not saying there's absolutely no consideration that trial lawyers could have given to that. But even if it was a strategic consideration, it was the wrong strategy. But overwhelming because. Well, we know it didn't work. So in that sense, you're right. But we have confidence that another strategy was more appealing. I have absolute confidence that knowing that the same person who confessed to killing this woman is saying this is why I killed her because I got into a quarrel with her. That has the ring of truth to a jury. It has a ring of truth to me. And it has a ring of truth to a jury. And it makes sense that he's he's confessing. He's unburdening himself. Now, the governments of self-serving here say, well, he's just confessed to murder in the same breath. There's no reason to think that what he's saying about why he did it has any less weight. And, yes, there may be some negative. There's always negative aspects to introducing evidence. And then you can say, well, it's a strategic decision. Well, some strategies are just dead wrong. And it was unreasonable and ineffective. Not to give that that penalty phase jury an explanation for such a brutal murder. There was no X. And even the trial counsel argued in the penalty phase. He argued I don't have the site right now. But in the penalty phase, he argued. Yes, I do. At the transcript, trial transcript page seven zero five four. I'll repeat that trial transcript seven zero five four lines three through four in the penalty phase. Trial counsel argued. I'm shortening and I'm lighting something from the set. Basically, he said the killing, quote, was a rage killing done in anger, hate and despair. He argued that. But he had no evidence to support that. That was the argument. That was an argument to make. And he made it. But there was not a shred of evidence to support it. Because the only evidence would have been Roland's statement to Lynette. That's exactly, in essence, what he told her. I killed her out of rage and anger because of the quarrel over what she said about ex-convicts. He had an argument, but no facts. Thank you. So what I'm going to do, counsel, is I'm going to give you ten more minutes. Okay, so the clock should read, make it 17. Thank you. I'll try to talk fast. We are here also to argue about two statements or arguments made by the trial district attorney during the penalty phase of Mr. Roland's trial. And in the certificate of appealability that was issued by this court in granting a certificate of appealability on these issues, among the cases that were cited, or at least the case that was cited, was a case called Weaver v. Bowersox. In the context of that case, I'm going to present these two issues together. But before I do, I have to do just one minute of mea culpa because we have a misstatement in our briefs. In our briefs, we refer to the prosecutor's arguments as having been done in his rebuttal argument. In truth, we went back into the record and we learned that he made only one argument, and it may have been a misstatement to characterize it as his rebuttal argument. And I just wanted to clear that up. Thank you for doing that. Now, Weaver v. Bowersox also had a discussion of combined arguments by a prosecutor which ran afoul of due process. In our case, we have two types of arguments made by the prosecutor. One was vouching and one was voters, the two Vs. In the vouching argument, what the prosecutor did was he argues to the jury in the penalty phase, I'm not asking you to do something that I wouldn't do myself. Now, in the California Supreme Court, when analyzing that issue, the court said, well, that was record-based and we're going to determine that that was okay. The problem with that statement is that the prosecutor didn't qualify his argument by saying, I'm analyzing the following facts, A, B, C, and D, and based upon those four facts, I'm not asking you to do something that I wouldn't do myself. If he had said that, there would still be a problem, but he never did qualify it that way. Now, when we get to the federal district court, the court from which we're appealing to this court, the summary judgment judge in the district court says, I find that there was a problem with that argument. I don't approve of it. It should be disapproved. He also found that under the totality of circumstances in the case, it didn't affect the outcome of the proceedings, but he does indicate, in his view, that that argument was inappropriate. Now, it's inappropriate, and the case law that Bowers, excuse me, that Bowers-Sox, Weaver v. Bowers-Sox relied upon, comes from the U.S. Supreme Court. So even if we're in a post-EDPA analysis, you have the cases of Berger and Young, which we cited in our briefs, which come from the Supreme Court, which the Weaver v. Bowers-Sox case relied upon, and apparently it had some impact on whoever issued the COA in this case because it was cited right in the order. Now, in the summary judgment ruling and in the Attorney General's brief opposing our position on this issue, there is reference to a case called Darden v. Wainwright, which really has no applicability in this particular situation. Darden v. Wainwright was a case where a supposedly improper argument occurred during the guilt phase, and the argument was invited by something that had been said by the defense lawyer prior to the argument that was being complained about. We don't have anything like that here. The trial counsel in Mr. Rowland's case did not invite that comment, which, in effect, is vouching by a prosecutor. Having been an ex-prosecutor, and I believe somebody on the Court was also, when you see a comment like that in a trial record, it's like watching chalk on a blackboard. I will agree. It caught my attention. But the test is not whether it caught my attention. The test under assuming AEDPA applies, and I understand you have the argument that it doesn't, but if AEDPA applies, it's got to be more than catch my attention. No, no, and I'm not saying, I'm arguing this issue as though AEDPA applies. I'm not conceding. Right. But I'm arguing this issue as though AEDPA applies because AEDPA still requires a reversal if the California Supreme Court unreasonably applied existing Supreme Court law or unreasonably applied the facts to the Supreme Court law. We're really dealing with the former in this instance. But don't we still have to apply some sort of harmlessness or prejudice error to what occurred here? Well, I think you do, but if you look at the Bowerstocks case, which drew upon those Supreme Court cases, that was an Eighth Circuit case. It drew upon those Supreme Court cases. And later, and I'm going to mention it with respect to the other final argument as well, when you look at Caldwell v. Mississippi, it's almost as if arguments such as these, which are so offensive, it's almost like an automatic prejudice, especially in the penalty phase of a death penalty trial. And when we get to the voter issue, that one, to some people, is even worse. You have a situation where the prosecutor gets up and he says, the vast majority of California voters favor the death penalty. And they even went so far as to vote out from office three judges who sat on the California Supreme Court. My labor law professor was one of those judges, Professor Grota. And they were voting against death penalties. Out they go. What that does, and what the vouching does as well, is it relieves the jury of the ultimate responsibility of the death sentence that they're about to determine whether it should be voted in or not in this particular case. Caldwell tells us that if the trial jury is relieved of that burden, in Caldwell it was the defendant has appellate rights. In our case, the argument was all the voters in California, or not all, the majority, a vast majority of voters, approve of the death penalty. So here's a juror sitting on this trial, and he is now being, he or she is being told that it may not be your responsibility because the public opinion in favor of the death penalty should weigh on you. Now, not only does it relieve the burden on the juror, it may also be going through the juror's mind, I may be subjected to shame. They may be picketing my lawn next week. It's like a mob mentality. It is a totally inappropriate argument. And under Caldwell v. Mississippi, if the jury has been relieved of its burden, that type of an argument runs afoul of due process. Now, the question the court posed a few minutes ago is, under AEDPA, why are we entitled to relief? We're entitled to relief because Supreme Court law was not reasonably followed. And Bowersox drew upon that and reversed the case in the Eighth Circuit because of inappropriate comments by the prosecutor, but they were also drawing upon Supreme Court law. So I think the situation here isn't a factual determination that was unreasonable. It's whether the law itself was applied unreasonably, and we believe it was. And we believe that on those two issues, we are entitled to the relief being sought here, whether or not the court analyzes these arguments individually or analyzes them collectively. And I think that the more appropriate thing is to analyze them collectively. And the reason why I say that is because they both affected the penalty phase. They both affected or both involved a theory where the jury is being relieved of its burden by the argument being made. And this, Your Honors, wasn't a slam-dunk penalty phase verdict. We had a situation here where, in a relatively short trial, the jury that decided the penalty phase was out two and a half days on this one issue, death versus life. We suggest that the conclusion from that is that it was close. Let me ask you about that because, to me, that is the key question in this case. The statements by the prosecutor, in my view, were wildly inappropriate, to put it mildly. But at this stage, with AEDPA and prejudice, what is the standard we have to apply, according to your view of AEDPA, to whether there was prejudice to your client? Well, I'm going to go back to Caldwell. In Caldwell, an argument which was even less egregious than these, in my view, resulted in an analysis that relief had to be given, and they were under AEDPA, and they had to decide prejudice. And it was, or maybe it wasn't, I'm not sure. Caldwell very much wasn't under AEDPA. Caldwell was earlier, in 1985. And it was different because what the jury is being told there is that it's not you, it's going to get reviewed later, so you don't. That's not at issue here. At issue here is a statement that this is what the California population has voted for, not that somebody else is going to look over your shoulders and review it later. So I understand the analogy in the sense that it's saying something about the outside world, but it's saying something, I think it's making a different statement. It is a different statement. And so how does Caldwell really speak to this situation? Because Caldwell speaks to arguments that are made where the jury is relieved of its ultimate burden. And that's the holding of Caldwell. I don't think that we, it doesn't have to be the same exact statement. But how is the jury relieved of its ultimate burden here? It's the one that has to make the decision. They're not being told somebody else is going to second-guess your decision or relieve you from the obligation or be the person that actually makes the final judgment. They're being told, look, this is what the law says. The California population has voted in favor of this. And so the burden being relieved is a very different kind of burden. Well, I'm not sure I would agree with that. I think that anything which is argued to a jury, whether it's the voter issue or the vouching issue, which basically says to them, to a jury, this is going to be a little bit easier for you because. And that shouldn't be done. And both of the issues that we're raising here, whether it's the vouching by the prosecutor or the voter issues, you know, that he argued, both give that message to a jury. They give them to him in different ways. But now combine the two arguments or the three arguments as they did in Bowersox. In Bowersox, you had a situation where the prosecutor argued to the jury, remember General Patton? He sent the boys out to battle and he told them they had to do their duty, and among the things they had to do was possibly kill people. All right? And that gave a message to the jury in that case that it might not be so bad as a matter of policy to give people a death sentence because it's done in other settings. And we have a similar situation here where in one instance the prosecutor put his thumb on the scale of justice by saying, this is the voters' opinions. And in both of those situations, the jury is being, I don't want to say relieved, but certainly been given a lesser burden in terms of what they're about to do, and what they're about to do is the ultimate decision. And one of the things that was also argued by the prosecutor in these contexts was he said that the only outcome where justice can be done is the death sentence. And we take issue with that, and that is really what the problem is. There would be justice if the jury based a non-death verdict on the evidence. And to suggest to the jury, I think it was the right thing to do as the prosecutor. I'm not asking you to do anything I wouldn't do. Only death is justice. The prosecutor comes into the courtroom, as we know from Berger and other cases, with a higher level of authority than anybody else, except maybe the judge, but certainly more than the defense lawyer, so he has more sway with the jury. The jury hears those kinds of arguments, and the jury is going to say, if that prosecutor says it's okay, if the voters say it's okay, it's okay by me. And that's the problem, and that's why you have these issues. That's why Caldwell was decided, and cases like that. I'm going to speak very, very briefly about the inadequate assistance, unless you have some questions on these issues, very, very briefly about what my colleague called the Riddle-Huber issue, which really is an inadequate assistance of counsel issue to a psychiatrist who we claim wasn't adequately prepared, wasn't given enough information to testify about the mitigation facts, the mental health mitigation facts that might have had an impact on the trial during the penalty phase of this case. What it kind of reminded me of, and I'm going to do this a little quicker because of the time limitations, I was just imagining last night and talking to my colleague, imagine a football game, and you have the last play of the game, somebody needs to rush for a first down. They bring somebody in who's out of shape, somebody who doesn't know the plays, and they put them in the huddle, they give them the ball, and they say run. And that's what they did with Dr. Riddle-Huber. He was brought into the penalty phase at the last minute. He wasn't given adequate information about Mr. Rowland's background. After the proceedings were over, he said, if I knew these things I could have testified to A, B, C, and D, but they didn't give me enough time. He doesn't quite say that. He seems to say there should be more testing done, and this leads me to suspect that maybe this should have been the diagnosis. And I'm troubled by this issue. One of the things that troubles me on your side is that we really don't have much firm evidence, and Penholster would complicate that today, but this case has been around for 20 years, and has anything been developed to suggest to us that the suspicions that he articulated in his declarations amount to more than suspicions? We tried. The answer is that we did try. We tried during the district court proceedings. One of the things we did when we filed the habeas petition, the last habeas petition, was we asked for funding and the right to an evidentiary hearing. So that's one thing that was done. But another very relevant comment in response to your Honor's question is remember the context of where we are today, the procedural context of where we are today. This is a summary judgment ruling. We are here to appeal a summary judgment ruling. In a summary judgment ruling, our position is the facts that were pleaded below are deemed to be true. Well, in a Penholster world, I'm not sure that's quite true, because if the district court and our court is limited to the record that's been developed in the state court, then there is no further evidentiary submission possible. Then it may be termed summary judgment, but we get that in a lot of cases. We have a lot of administrative review, for example, that it's called summary judgment, but in reality it's simply a judgment on the papers because the papers are all you're going to get. So I hear your argument about the Rule 56 standard, but I'm not sure it really applies here. If there's not room for additional evidence, then the district court's going to call it summary judgment for lack of another term. Okay. Well, let's go back to the trial record then for just a minute. Among the things that we say under Rule 56 that need to be deemed to be true is the doctor says, I didn't have enough time. That's in his declaration that was filed in the state court. And in the state court, during the penalty phase, the prosecutor at the end of the trial when he gave his penalty phase submission, took advantage of the lack of preparation and told the trial jury, disregard everything Dr. Riddle Huber said because he was unprepared, unprofessional, and he didn't even have enough time to prepare this case. Didn't interview the defendant enough, didn't conduct enough testing. So he took advantage on the trial record in the state court that is now for review in federal court in the fact that we had an expert that hadn't been prepared and hadn't been given enough time on the critical issues. What he then says in his declaration, it also filed in the state court, is that if I had been given enough time to do this, I would have found the following things. Now, each and every one of those following things might not in and of itself have disqualified the death penalty. But in a penalty phase, all mitigation is relevant. Wiggins v. Smith tells us that from the U.S. Supreme Court. And as my colleague argued and suggested a few minutes ago, you're really only trying to reach one juror who might have lingering doubt as to whether or not it's appropriate to invoke the death penalty. This jury in Rowland didn't hear these mitigating facts. And they didn't hear it because the expert wasn't prepared. Okay, why don't we go ahead and wrap it up there. We will give you some time to rebuttal. I just have one question. Sure. Is it too late to exhaust your Jones claim in state court? I'm sorry? Is it too late to exhaust your Jones claim that the death penalty is unconstitutional? Can you go back to state court and exhaust that claim? I don't think it is. Do you want to think about that and take it up in rebuttal? Very well. You guys can think about that one. We'll get back to you. Thank you. Okay. Good morning. May it please the court. Alice Luster of the California Attorney General's Office on behalf of the respondent. Very briefly, Judge Wardlaw, we submit it would not be too late to file a Jones claim in the state court. The California Supreme Court in the Sayamanu case, which we cited in our briefing on this issue, indicated that although looking at the Jones record, they would not have granted relief. They very specifically indicated that they thought it was something more appropriately brought as a habeas. So I think to the extent that we can address that. So thank you. Okay. Appreciate that. Thank you. Regarding the AEDPA argument, Your Honors, the Woodford v. Garceau is indeed on point and is controlling. The only difference in the wording is the language in the Northern District Rule that talks about deeming, that will be deemed a petition. However, the important thing is to look at those sections of the rule that they rely on. They're found under the section of stays of execution. Subsection A says that a stay pending final disposition, if a petition is filed, upon the filing of a petition, the judge will order a stay, and that stay will be, in effect, pending final disposition of the petition in this court. We were not operating under that. Under subsection B, and this is, I'm sorry, at page 120 of the excerpt, a temporary stay for the appointment of counsel that says that when the accused seeks appointment of counsel, that the application for that, again, the language shall be deemed a petition, but upon the filing of this application, the district court shall issue a temporary stay. It's for a short period of time, solely for the purpose of appointing counsel. And then subsection C, which is where we come into the statement of non-frivolous issues,  That's when new counsel is appointed. They come to the court, and at that point, they are required by the rule to file a specification of non-frivolous issues to support their stay request. But again, under that subsection, it's only a temporary stay until a petition is filed. So if you file an actual petition, you get a stay pending the outcome. If you file anything else, namely what petitioner filed in this case, all you get is a temporary stay until a petition is filed. I think it's very clear from the way the rule is written, except for that language, and this was mentioned in the questioning earlier, there was no need in 1990 for a petition to be filed. What was going on then was across the country, there was some dispute in different states, in different districts, as to whether or not a federal district court had the authority to issue a stay of state court proceedings in the absence of an active, ongoing matter or case. That was ultimately settled in McFarland v. Scott by the U.S. Supreme Court, where they said these shell petitions aren't necessary. We have the ability to hold off and appoint counsel and issue a stay regardless. But this court in its death penalty task force, from where these local rules grew out of, had said, yes, we have the authority to issue a stay so that the person can get counsel, can get a petition on file. And it's very clear that that was the purpose of this rule. For whatever reason, the northern district chose to call it a petition. Maybe they thought it was easier for the clerk's office, I don't know. To the extent, and I guess we'll be seeing a motion for the court to take judicial notice, but we will certainly be filing an objection because whether or not, even if there was a person who was on the court from our office at that point, we have no idea how the proceedings went, whether or not that person did object, did not object, whether or not they could have vetoed any certain language. We think it's just simply irrelevant. Well, yeah, I'm not sure ultimately it matters. Even if someone in the AG's office thought that was the rule, the Supreme Court said what it said in the case, I think we have to deal with that case regardless of who was on the composition of that committee. That's correct, Your Honor. And in Woodford, we have the identical progression of filings. We have the inmate came to district court and said, I need an attorney, I need a stay. The court granted one. They came back and the counsel was appointed and they asked, the state moved in that case to dismiss because there was no statement of non-frivolous issues as was required to be filed in their local rule. And the court said, or the district court ordered them to file it. They did prior to AEDPA. AEDPA passed and Woodford v. Garceau said that is not enough. In fact, the language in Woodford specifically talks about whether or not the, I'm sorry, and the court said, if on that date, meaning the effective date of AEDPA, the state prisoner had before a federal court an application for habeas relief seeking an adjudication on the merits of the petitioner's claim, then 2254D does not apply. And if you look at the application that was filed that includes these non-frivolous issues, this memorandum and application, the prayer for relief is based on the foregoing petitioner respectfully requests that this court issue an order extending the stay of execution for 120 days to permit the preparation and filing of a habeas corpus petition by newly appointed counsel. Not an amended petition, not even a finalized petition, to permit the filing of a petition. All they wanted was, as required by the rule, the ability to extend their stay for another 120 days. And I think in terms of, Judge Wardlaw, when you were asking earlier about the effective date, I don't have the actual date that AEDPA was passed by Congress. I believe my opposing counsel was correct that the effective date was the date that it was signed by the president. But it was certainly the subject of much talk, of hearings for an extensive period of time prior to that effective date. It was, it's filed the Anti-Terrorism and Effective Death Penalty Act of 1996. So presumably it was passed at some point in 1996. But certainly there were extensive congressional hearings. For what it's worth, Wikipedia reports it was signed into law on that date. Yes, that's correct. It was certainly signed on that date. The Internet is a completely reliable source. But I believe they are right on that point, that the effective date was the date that the president signed it. But simply, it certainly was not an unknown quantity prior to that. It didn't come out of the blue. That's correct, Your Honor. But it gave you a year from the effective date within which to file your petition. That's correct. It gave an automatic extension of the statute of limitations. Well, that's when the statute of limitations first kicked in. That's correct. So the one-year period comes from that, I guess. That's correct. And they are not, they do not have a statute of limitations. There's not a complaint about that. I mean, the reality is we get a lot of non-capital cases where the habeas process is started off by some handwritten filing by the petitioner itself. And if that were filed before what turned out to be the magic date for Aetna, that's enough. That's correct, Your Honor. So this isn't a lot different from that, but your argument is under Garceau it's just different enough. It is, Your Honor. And because Garceau specifically pointed that what they're asking is, is there something before the court that asks for relief on the merits? And typically, those handwritten petitions will ask that their sentence be set aside. And, in fact, note that in this statement of non-frivolous issues, they've only included, and this is with counsel, two of the claims that were ultimately filed. They didn't even take the time to include all of the claims that were clearly exhausted from the state direct appeal or the state habeas petitions, which they would have had no matter how new counsel was, would have been a fairly simple thing to do. And a lot of times we also see that from inmates is that they will basically photocopy their direct appeal brief and file that and say, please give me relief. Please set aside my judgment. But, again, the relief that was asked here in accompanying this motion was for another 120 days to file the petition. The merits were simply not before the court, as Woodford requires, EDPA applies. Now, turning to the Lynette issue, certainly there are always possible arguments to be made, but just because the trial court suggests things that could be considered when he was dealing with the question of whether or not he was going to allow defense counsel to bring in portions of Lynette's statement without allowing the prosecutor to then further expand upon that, that was how this came up. Trial counsel had litigated this repeatedly, had gone through this with the court. We want to bring in these statements, but we don't want the prosecutor to be able to get into some other things. I confess I'm not an expert on California evidence law as of the time of this trial, but I'm puzzled by the pick and choose and I'm puzzled by the notion how the defense can get in statements by the defendant that favor the defendant, not an admission by party opponent or so forth. So how is it that, I mean, is that something the defense could get admitted even if she's testifying? No, Your Honor. Well, they, actually that is, I think, subject to question because it certainly would not be an admission of a party opponent. So I'm not, I don't think it's necessarily clear that the whole thing would have come in. Excuse me, either the whole package comes in or you can't pick and choose. But that is certainly the case. To the extent they could have gotten those statements in at all, it would have had to have come in as the whole package, and that's what the court was telling them. The court said, I understand there might be reasons why you want this statement and that statement in, but if it comes in, you're standing into dangerous waters because all of it's going to come in. And what is significant is that the, it's clear from the record that counsel affirmatively decided at the guilt phase, in light of that renewed ruling by the trial court, not to put these statements in with Lynette during the guilt phase. However, they asked that she be held and subject to recall, which clearly indicates that they were keeping their options open. They were considering the chance and the ability to recall her during the penalty phase. So they were not just saying, oh, well, we can't bring it in, so we're not going to. They kept her subject to recall. Now, they ultimately determined not to, and we think the respondent submits that there are some good reasons for that. Not just the statement about her assertion that Roland said, I will kill my parents if they find out about this. Now, yes, she said that he agreed, that he called her and said, oh, no, I said it will kill them. But when questioned in her statement, she says very clearly, no, he said, I know what I heard him say. I know that's what he says he said, but I know what I heard him say. He said that he would kill them. She was asked, did they get along with his parents? No, she didn't think he had a very good relationship with his parents. So that statement certainly would not have been helpful to his case at the penalty, to find out that there was at least the potential of a threat to kill his parents as well as Jerry Richardson. As this court has already pointed out, all the fight over the drugs does is add a second reason to kill Richardson. It doesn't do away with the first, that he raped her, which the jury has already found. Again, recalling Lynette would have allowed the prosecution to revisit and reemphasize the circumstances of the crime more, because if the defense is up there offering her for some other reason not to have killed her for the rape, then certainly the prosecution has the right to go over that again. Ms. Lynette, yes, he confessed to killing her, which is a bad thing, but he also said very clearly to her, you're going to hate me for this, is this going to change how you feel? He was wanting to minimize the impact of his relationship with Lynette, the impact of this murder on that. He did not tell her at all about the rape. In fact, he told her that when he dumped Richardson's body, she was fully clothed, which we know she was not from the evidence. Clearly, he was not giving Lynette the full story. The other tactical issue, and this goes back to the argument that Roland makes at this point, is essentially what did they have to lose? There's nothing left to lose. Well, first of all, that is clearly not the standard. In the Supreme Court held in Knowles v. Merseyance, that is not the test. But also, this court has to look at what possible tactical reasons could there have been. Again, not wanting to bring in the statement about the parents, but also we see in the guilt phase closing argument. Now remember, Lynette is the one who testified to the jury that he comes in and talks about how he killed this woman. In closing, and this ties into the conflict issue, but the defense counsel said, let's talk about Lynette. Let's talk about her credibility. This got this baggie, and they implied that maybe Lynette kept the small baggie with the methamphetamines. He said, let's look at the bricks that have to be built into this wall that the prosecutor is trying to make to show guilt beyond a reasonable doubt. The attempt that they were making was to cast some doubt on Lynette's credibility. Again, tactically, you might not want to come into court in the penalty phase and say, well, you know, I told you she really wasn't credible during the guilt phase because I didn't want you to consider the parts of his confession, but now I really, really, really want you to believe that she was right and the fight was all about drugs and had nothing to do with the rape. Now that's not going to be terribly helpful either, the respondent submits, and again, when this court has to look at all of the possible tactical reasons and determine that none are adequate, then simply we cannot find, especially under the doubly deferential standard that AEDPA applies to ineffective assistance claims, that counsel was ineffective. Turning to the arguments by the DA. Oh, I'm sorry. Since you mentioned ineffective assistance of counsel, I wonder if I could ask you to speak to the other IAC argument, which had to do with the presentation of mental health evidence at the penalty phase. And I had trouble sorting some of this out. We have two different phases, guilt phase and penalty phases. It's clearly established that defense counsel began contacting mental health professionals more than two years before trial, at least with regard to guilt issues. But guilt issues and mitigation issues aren't always the same. And what do we know about when counsel began consulting mental health professionals with regard to the mitigation or penalty phase arguments? Well, we do know that Dr. Riddle Huber was not asked about testifying at the penalty phase until just as the penalty phase was beginning. And if that's all that it had, if there had been no prior examination, that probably would be a red light flashing right there, because there are cases that talk about having to thoroughly prepare. So what do we know? What confidence can we have that there was legitimate consultation on mitigation issues prior to that date? Well, first of all, we also know that Dr. Riddle Huber, part of his preparation was to interview the mental health experts that had already been involved in this case at the guilt phase. I think the most significant thing that we can do to have confidence, the most significant reason for having confidence, and I would ask this court to take the time to read Volume 70 of the trial transcript, which with all but a very few introductory pages, is Dr. Riddle Huber's testimony at trial. Dr. Riddle Huber gave extensive testimony. To read his declarations, one would think he may have testified for about ten minutes to say, I was called in to see if he had attention deficit disorder as an adult, and I did some testing, and I couldn't find that. So that's what he did. But what he testified to, he testified that appellants suffered from borderline personality disorder, which he on multiple occasions throughout his testimony talked about being very serious. He said there are times when a person suffering from that can be psychotic. That's at pages 6,756 to 58 in the trial transcript. He talked about the signs and symptoms of that, and that it can be just as disruptive as schizophrenia. He had a diagnosis for Mr. Rowland on all five of the axes that are found in the DSM, Diagnostic and Statistical Manual. He talked about the impact of childhood ADHD on development and its effect on adults. He explained the difference, and this is at 6,806 to 15, between borderline personality disorder and antisocial personality disorder, which the prosecutor was trying to get him to admit to a diagnosis, and he explained why that was not an appropriate diagnosis in Mr. Rowland's case. So he differentiated that. He explained in detail stressors leading up to the murder. He explained about the loss of cognitive control that Mr. Rowland suffered. He tied all of this to his treatment by his mother and father. He talked about the drowning attempts that the mother made. He talked about that his treatment by Dr. Stone as a child was not adequate and, in fact, may have been counterproductive given his seizure disorder. He talked about the impact that we now know that Ritalin is not good for people with seizure disorders and that that, therefore, was not a good treatment. He talked about the benefit that Rowland received of the treatment in prison, and his mental health expert from the prison also testified, and that that made him amenable to treatment should he go back to prison. Sorry, counsel. Yes. Counsel, what Dr. Riddle-Huber says in his declarations is that one piece of evidence in particular was not provided to him, the medical history report, which would have shown his traumatic birth, and that could have caused organic brain damage, which we reviewed consistently as mitigating. And that would have set him on, if he had that, it would have set him on a course of testing Rowland for organic brain damage. That's correct, Your Honor. He does opine that. However, when he also, if you look at the declarations, what he talks about is organic brain damage could lead to the loss of control issues. And so what we have is Dr. Riddle-Huber testified to the jury about the actual results of these, whether it's organic brain trauma, whether it's the drownings, whatever it is. He talked about the hard results that come out of that. So we're really looking at, okay, was it fetal distress that caused it? Was it the drowning attempts by the mother that caused it? In any event, we know from what Dr. Riddle-Huber says that he experienced these loss of control issues, the ADD, which he also said could have been a result of the organic. But more significantly, and particularly as it goes to the ineffective assistance, the deficient performance prong, in his 1996 declaration, which was attached to the summary judgment motion in the federal court, Dr. Riddle-Huber says twice. First, he says a complete and proper diagnosis was not possible at that time, meaning the time of trial, because brain image study equipment, and I'm sorry, this is on page 2 of the 1996 declaration, because brain image study equipment and the ability to interpret the results of such testing available at the time of Mr. Rowland's trial in 1988 was not advanced enough to diagnose the neuropsychiatric disorders suffered by Mr. Rowland. And then on page 5, again, he says a precise diagnosis of Mr. Rowland's complex of disorders, including information concerning their precise nature, location, and extent, is not possible until a complete spec test and analysis is performed. So even in 1996, they still had not performed the proper testing, but even if they had, Dr. Riddle-Huber very clearly states that the testing available in 1996, which may have shown it, and he's still speculating there, because it hasn't been done, was much more precise than what was available at trial. And you simply cannot find that counsel was deficient for not performing tests that would not or might not have shown the results that he is suggesting were possible. But again, we would ask the court to read through Dr. Riddle-Huber's testimony. It's very extensive. He talks about many of the problems and probably one of the more extensive expert testimonies that this court may have seen in a capital case. The argument by the district attorney, there were two sections, one the personal opinion and two the voters. And again, I think the key here in answer to Your Honor's question, what is the standard? The standard is Brecht for harmlessness. Is it straight Brecht or is it the AEDPA version of Brecht? It would be the AEDPA version of Brecht, Your Honor. I mean, you get the deference, certainly the deference to the state court's findings. So no reasonable court could conclude otherwise. Yes, Your Honor. And what is important under both of these two issues is to look at the context of the argument. Now, my opposing counsel said that the prosecutor didn't analyze it. He didn't say piece of evidence 1, 2, 3, 4, 5. We submit he did analyze it. In his argument, he said, after he says, I've made it my practice never to ask others to do what I would not do, he says, and based on the system of justice where the punishment should fit the crime and the criminal, based on the law in this case, as I've explained it and the judge will, based on, and here's where he spells it out, the savagery and brutality, the horror of the crime against Mary and Geraldine Richardson, based on his history of past criminal activity involving violence, which represents a man of extreme cruelty, depravity, and violence, I now stand before you and ask that you impose that. So he did.  Maybe not as detailed, but he very clearly did tell the jury, this is why I think it's appropriate. I'm sorry? But to go to their point, I mean, if the case is as strong as you say it is, why did he have to go there? I'm not asking to speculate in his mind, but that's at least some evidence that maybe it wasn't that strong after all. I mean, you don't have to pull, you don't have to throw a rabbit punch if the guy can't defend a jab, so why did he throw rabbit punches in this case? Your Honor, I think in the heat of trial, I think attorneys get caught up, they say things maybe that aren't the best ways of phrasing things, they get caught up in the heat of the moment and sometimes say things that they probably would better have not been said, but that doesn't take away from the strength of the case. And again, when you look at his argument as a whole, he's repeatedly asking the jury to consider factor after factor after factor of what was put into the evidence, and then even more so when you look at his statements made after talking about the voters. Now, it would appear he was anticipating an argument, which is fairly common in death penalty cases, that the defense will say, well, the death penalty is bad, you just shouldn't impose it. It's the wrong thing to do. Now, granted, this was anticipatory because this was not in the rebuttal, but that would appear to be what he was saying. He's telling the jury this is the law, the voters have said this is the law. And again, we can discuss whether or not he should have done it, whether you or I would have said that, but in context, what he says immediately after that is, and this is in the supplemental excerpts at pages 59 and 60, not all murder is qualified for the death penalty, as you know. There must be a special circumstance, and he explains that. In this case, it's rape. But then he says, but not all people that qualify for the death penalty should get the death penalty. So he's telling the jurors, okay, yes, the voters have put this in, and they've required a special circumstance, but even if you have murder and the special circumstance, you still may have people that you don't apply the death penalty to. He's very explicitly telling them that. It's only those people, like Mr. Rowland, that the bad outweighs the good in his background, and so substantially outweighs the good of the mitigation in his background that death is justified, death is appropriate, death is warranted. So he is telling the jury there are people that could be at this stage, and, in fact, a few lines later, he says, the law favors neither penalty at this stage. It's a weighing process at this stage. And how you can... So, counsel, why bring in the Rose Bird situation at all? I mean, it just seems so inappropriate, irrelevant, and inflammatory. I mean, I'm older than you are. I remember that going on at election. That was very inflammatory, the whole thing. My husband was sleeping on the couch for months over that. But it was highly inflammatory. And, Your Honor, you know, again, I wasn't there. I don't know why the DA chose to make that statement. The California Supreme Court said that they didn't think it was appropriate. But, nonetheless, this court has to look at the argument in context and has to make it ultimately either whether you look at it as part of the finding of whether or not there was error, there must be... Do you think it belongs at all? Do you think either his saying, I wouldn't ask you to vote for death penalty if I wouldn't do it, or bringing up the Rose Bird election, which was around the same time, was appropriate at all? Your Honor, I would not have supported those statements or made them myself, certainly. But I think the key in this case is that what he said afterwards and what he said immediately afterwards is, even if the voters say that there is appropriate to be a death penalty, and even if you have someone that would seem to meet all of the requirements for the death penalty, there may still be a person for whom the death penalty is not appropriate. It's not Mr. Rowland because of his history and the horrific nature of his crimes. But there could still be someone that if you weigh the factors, and again, he said the law favors neither penalty at this stage, even after all the findings of eligibility and after everything he said about the voters, he still tells the jury the law favors neither penalty at this stage. Unlike the Bowers-Box and Caldwell cases, this is not, as the court noted earlier, this is not a case where the jury was told, this is not your fault if you vote for it. This is not a case where they said, you're a soldier, go do your duty, whether you feel you should or not. In this case, his reference to the voters, while certainly unartful, was in there. It was, you know, this is the law, but you need to apply it. And I see, I'm sorry, I've gone over my time. Let me ask, do my colleagues have any further questions? Judge Clifton, Judge Wardlaw? No? Okay, thank you very much. Thank you, Your Honor. We'll give you, take ten minutes, for the both of you, for Team Levine, ten minutes. I am just going to do some rebuttal on the AEDPA issue. When granting the motion for COA, this court, two judges of the court, granted a COA on the issue whether or not Petitioner Rowland had reasonably relied on the local rule. And my submission is yes, he and his attorneys reasonably relied on the local rule. Assuming that's true, how do we get around Garcelle? That's still the big problem for you in this case, is that Garcelle case is not good. So you've got to walk us through how to get around it. There's a due process reliance interest. This habeas corpus has equitable foundation. The writ of habeas corpus is ultimately equitable in nature. But if we were to agree with you that there's some sort of due process right here, under AEDPA, don't we have to have found the Supreme Court, or the Supreme Court would have to have told us that? No, you can find that because of the local rule, Petitioner and his attorneys reasonably relied on that. So in this case, AEDPA doesn't apply. In what case would we rely on to say that? You would rely on all of the cases that establish estoppel by entrapment and estoppel by, I cited the court, the Raley line of cases, by analogy, where the government tells somebody that something is okay, and then the person does it, and then they prosecute them and say, ha ha, I guess it wasn't okay. But there is the provision under AEDPA, and the Supreme Court has hit our court pretty hard in the past on it, that to find some sort of new constitutional right or rule, we can't do that at our level. It has to come from the Supreme Court. This court is strong enough. I have no doubt. This is not finding a new rule. We've been beaten down before. We're going to be beaten down again. You want us to be tough about it. Absolutely. Okay. Fair enough. I have full confidence in it. But it seems to me, Hodge, that with all due respect, how can you say lawyers can't rely on the first entry in the docket sheet? In capital letters on ER 155, on 8-26-1994, petition for writ of habeas corpus, file. Now, the government says, well, they look at ER 129, the memorandum of issues, and they say, even petitioner's counsel in the last paragraph, they say, based on the foregoing request this court issue, I'm reading from ER 133, based on the foregoing petitioner request this court issue an order extending the stay of execution for 120 days to permit the preparation of a filing of a habeas corpus petition. All they would have had to do is put in amended habeas corpus petition and, as I said in my opening argument, simply change the heading to petition for habeas corpus. Your Honor pointed out that a pro se petitioner writing a letter with one single sentence on it, my issue on federal habeas corpus, that would be a federal habeas corpus petition. Counsel could have easily changed this. There was no reason, but their reliance on the district court's order gave them no reason to do that. As a matter of due process, this court should hold that EDPUT does not apply in this case under equitable principles. If the Supreme Court says you're wrong, well, okay. But I think that given the situation here, you will prevail. Finally, the government says, well, they only put two claims in, but that's the whole point of amended petitions. You would have added more claims as the lawyers amended the petition. Thank you. You have the remaining time of five and a half minutes. Thank you. I don't think it will take that long. Let me very, very briefly talk about an argument I heard a few moments ago regarding the final arguments by the prosecutor, and there was some suggestion that those arguments were, at least with respect to the voting, was anticipated that the defense would argue something else, therefore the arguments by the prosecutor on the voting would be justified. Whether or not it was anticipated, it never happened. The defense never argued something which, even if there had been a rebuttal to it, would have justified the comments about the voting. At least from my perspective, don't worry about me defending what the prosecutor said. For me, it really is about the prejudice issue in this case. Let me also respond, though, on the IAC issues regarding the psychiatrist. Judge Clifton asked a question regarding what did we know about what had transpired prior to him hitting the witness stand in the six or seven days or eight days before he did. What we do know is that besides the fact that the state court record says I didn't have enough time and I started consulting eight days before, we also know that the prosecutor, when he gave his summation to the jury in the penalty phase, says to the jury, disregard what this psychiatrist said because he didn't prepare enough, he didn't have enough time to prepare. The prosecutor is, in fact, arguing our position. And the objective facts that are in the record support that argument. He didn't have enough time to prepare. Now, when it comes to what he found, I think some questions were raised regarding what his findings were subsequent to the trial proceedings. He never had a chance to describe to the trial jury in the penalty phase the traumatic birth. That's just one example. And the fact that the defendant was having convulsions from the birth and during his early childhood. Among other things, if the trial jury in Roland gets to hear those things because the expert witness who his lawyers hired had enough time to prepare it, had the records to prepare it, and had the opportunity to tell the jury about it, then if even one juror would have said, I don't think this fellow should be put to death because of his background, because of the things that occurred to him during the time of his birth and subsequent to his birth. And that didn't happen here because Dr. Riddle Huber was given the case on the run. And earlier in the arguments today when we were talking about the arguments by the prosecutor, I said that you get the feeling when you listen and read those that it's like scratching a chalkboard. When you have an expert who is given the critical mitigation evidence, basically at the last second, or eight days before is the last second in this kind of a situation, it's sort of like scratching a chalkboard. Any defense lawyer who is doing his job in a capital case knows you don't wait until then. That's one thing. And then you give him everything that's available so he goes in prepared, looks like a professional, and gives persuasive testimony. That did not happen here. Thank you. Can I just ask, did the trial counsel for Roland submit a declaration in any of these proceedings explaining why he didn't ask Riddle Huber to testify until eight days before the penalty phase? I don't think so. Okay. I don't think so. Did you hear that, Judge Wardlaw? I heard it. Okay. Thank you. Thank you. Unless there's nothing further, I'll conclude it. Thank you so much. Thank you to all counsel in this case for their fine argument. This is the only matter we have today, and so we are in recess. Thank you. This matter is submitted.
judges: Wardlaw, Clifton, Owens